(C. D. 1440)

Columbia Floor Covering Co., Inc. *v.* United States

United States Customs Court, First Division

(Decided July 7, 1952)

*Strauss & Hedges (Barnes, Richardson & Colburn (by Edward N. Glad)* of counsel) for the plaintiff.

*Charles J. Wagner,* Acting Assistant Attorney General *(John J. McDermott* and *Richard E. FitzGibbon,* special attorneys), for the defendant.

*Joseph F. Lockett* as *amicus curiae.*

Before OLIVER, COLE, and MOLLISON, Judges

COLE, Judge: A shipment of floor coverings, invoiced as "Ispahan Rugs" in sizes 9 feet by 12 feet and 8 feet by 11 feet, and imported from Italy in 1947, was classified under the provision for "Wilton carpets, rugs, and mats; * * * and carpets, rugs, and mats, *of like character or description"* [italics added] in paragraph 1117 (a) of the Tariff Act of 1930 (19 U. S. C. §1001, par. 1117 (a)), which, in its entirety, reads as follows:

PAR. 1117. (a) Axminster carpets, rugs, and mats, not specially provided for; Wilton carpets, rugs, and mats; Brussels carpets, rugs, and mats; velvet or tapestry carpets, rugs, and mats; and carpets, rugs, and mats, of like character or description; all the foregoing, valued at not more than 40 cents per square foot, 40 per centum ad valorem; valued at more than 40 cents per square foot, 60 per centum ad valorem.

The basis for the collector's classification is that the rugs in question are "of like character or description" to Wiltons.

Plaintiff alleges that the merchandise is not within that category, and contends, therefore, that these rugs should be classified under the general provision for "all other floor coverings not specially provided for," under paragraph 1021 of the Tariff Act of 1930 (19 U. S. C. § 1001, par. 1021), as modified by the General Agreement on Tariffs and Trade, 82 Treas. Dec. 305, T. D. 51802, carrying a dutiable rate of 20 per centum ad valorem.

Testimony of Richard F. C. Bemporad, president of the plaintiff corporation, supplies the factual foundation for plaintiff's case. The witness has been engaged in importing floor coverings, including rugs, since 1935. Prior thereto, and between 1918 and 1932, he manufactured rugs in Italy, where he produced articles like those in question (plaintiff's illustrative exhibit 1). Between 1932 and 1935, he was manager of a mill in Belgium where Wilton and imitation oriental rugs were manufactured. His selling experience, which began in this country in 1925, included the products of mills in Italy.

The rug under consideration is called "Ispahan" and is made to imitate an oriental rug. It is produced on a plush loom that weaves two rugs at the same time. This particular type of loom cannot use carded wool yarn, carpet yarn, or any other yarn that is not very smooth and very strong. It has two sets of warps that form the tops of the two rugs being woven, and one weft to support the pile. A

special jacquard attachment, operating reeds of the loom, creates the design.  So-called frames, or creels, each containing yarn of a different color, feed the yarn to the jacquard attachment.  The pile yarn goes around the weft and then returns to the back of the rug, remaining on the outside unless the pattern requires the particular color to be continued in the pile.  In the rug under consideration, the pile yarn is composed of rayon, and the weft consists of cotton to make the rug more pliable in simulating an oriental rug.  The article, illustrative exhibit 1, *supra*, is concededly in chief value of rayon. After removal from the plush loom, the material is put through a "splitter," where it is cut right in the middle to form the two rugs. Excess yarn, resulting from operation of the splitting machine, is cleaned away by hand from the back of the rug.  The plush loom cannot make a selvage so the fabrics have to be bound or overlocked which is done in a subsequent machine operation, supplying finished edges for the rugs.  Exclusive use of the merchandise is as a "throw-rug," described by the witness as "a light in weight and flexible rug that you can put wherever you want to, either in front of the sofa, under the table, or between doors.  That is a throw-rug.  Sometimes they are large.  You can have a throw-rug 9 by 12 in front of a sofa."

In manufacturing a Wilton rug (plaintiff's illustrative exhibit 4), there are two warps, known as chains, suggestive of the manner in which they operate.  The binding chain forms the back of the rug. The filler chain ties the weft.  The Wilton loom has wires inserted therein which are manipulated by a jacquard attachment, forming the design.  The outstanding characteristic of the Wilton rug is its pile, created by the wires fitted to the loom.  The construction was described by the witness in this way:

\* \* \* We insert 12, 14, 16 wires in the loom, which are in turn colored with the yarn of the color that we bring up with the Jacquard, and then for the purpose of keeping the strength in the rug, we pull the last wire; that is to say the first one inserted, we pull one at a time; one end we take, the yarn going through, and then we pull back the last one.

By operation of the jacquard attachment, the wire is given a gear-like movement and "is pushed in and pulled out."  The yarn of the pile is woven around the weft.  Attached to the last wire to be removed from the loom is a knife that cuts or slits the pile leaving two straight pieces.  Cutting the pile is always done in the loom and upon removal of the last wire.  During the course of weaving a Wilton rug, all of the yarn does not operate into the surface.  Consequently, some of it is "called back" inside the back of the rug.  To hide that yarn, fillers or "stuffers" are used.  The design of the rug does not ordinarily go to the back, which is always treated with sizing to give it stiffness. In the process of weaving, the Wilton rug acquires a natural selvage and is completely finished upon leaving the loom.  Wiltons are used, like the merchandise in question, as so-called "throw-rugs," and they

are also employed as wall-to-wall carpeting and are made into runners, sewed together to obtain a desired width.

Comparing a Wilton with the rug under consideration, the witness stated that the only likeness between them is that both are pile rugs. Although the plush loom, producing the article in question, and the Wilton loom both employ frames or creels and have jacquard attachments, such mechanisms operate differently in the respective types of looms. The "Ispahan" rug is raggy and flexible, and has the effect of a fine point, imitating an oriental type. The pile is woven comparatively close. The consistency of the front, a "type of velour," created by the grain of the yarn, results in velvet-like appearance, similar to the material used in covering chair seats. Unlike a Wilton rug, this "Ispahan" rug is without a foundation and lacks sufficient body to be sewn together like runners.

During the course of cross-examination, the witness identified two pieces of material, defendant's illustrative exhibits 7 and 8, as being made on plush looms, and which, he stated, were not like Wilton rugs, first, because of the brush-like appearance of the pile which is characteristic of products of plush looms, and second, because some of the yarns were missing, a condition that never exists in Wiltons.

Three additional witnesses were called by plaintiff. Their testimony, however, is largely, if not entirely cumulative to that hereinabove reviewed and no useful purpose would be served to outline the same. We, therefore, turn to defendant's proof, introduced by five witnesses. Following is a summation of the testimony of each.

Joseph L. Baker, vice president in charge of all manufacturing by Art Loom Carpet Co. of Philadelphia, where 50 Wilton looms are in operation, described two definite and distinct types of such looms.

The conventional Wilton loom has creels or frames of colored pile yarn and is equipped with the jacquard attachment that selects the particular color required by the pattern. Each color is woven over a wire mechanism in front of the loom. In such operation, only a single fabric is woven, either with a cut or round pile, depending on whether knives are affixed to the wires as they are withdrawn from the loom.

The double shuttle Wilton loom weaves a double rug, face to face. There are two sets of foundation warps, one for the bottom cloth and one for the top. The top cloth goes to one spinning roll and the bottom to another, resulting in two identical fabrics being rolled up and backed together. The double shuttle loom, like the conventional type, uses creels of yarn and a jacquard attachment. The witness described its operation as follows:

* * * The other type of loom is a double shuttle Wilton loom that selects its pile yarn from a creel in the back of the loom, the same as the other wire Wilton. The pile yarn is passed through a Jacquard mechanism the same as on a wire Wilton loom. The yarns come through to the front of the loom, and because of the Jacquard selection, the colors that are called are passed between one fabric to the

other fabric. The colors that are not called, in our particular case varied in either one or the other fabrics. Then as the color is not called, after it has been called, it returns to rest, as you might say, and stays buried, in our particular case, in the back of the fabric in which it was designated. That fabric then, after about three or four inches of it has been woven, has a double Wilton fabric, is split with a splitting mechanism on the loom. Two rolls of carpet of similar face appearance are taken off the loom.

All Wilton rugs produced by the witness have a stiff jute back, and are used as throw rugs. None has the design carried to the back.

Contradicting plaintiff's testimony, the witness identified the materials, defendant's illustrative exhibits 7 and 8, *supra*, as pieces of Wilton fabrics, recognizing them as such because of their basic construction, general appearance, and the color arrangement, including the manner in which the colors were planted. Referring specifically to the piece of Wilton rug, illustrative exhibit 8, *supra*, produced by the witness and regularly sold for "twenty years or more" as a Wilton rug, he testified that the similarity between that product and the merchandise in question (plaintiff's illustrative exhibit 2), lies in the density of the pile and the general color arrangement. Differences between the two articles exist in the rigidity of the back—the Wilton is "fairly firm"; the present merchandise is more flexible—and, also, in the manner of weaving, the rug under consideration having the pile yarn go directly through to the back, while the Wilton rug has the dead yarn buried between the back and the filling. The pile yarn in the Wilton rug is wool; the "Ispahan" rug being discussed has synthetic textile (rayon).

Identifying another product as a Wilton broadloom made by his company, defendant's illustrative exhibit 9, the witness stated that it was produced with the use of two frames of yarn on a double shuttle loom, woven double and sheared, the stuffer, binder, and pile, being of cotton, and the filler of jute. Some of the pile yarn appears in the back; some is buried.

Charles S. Barrett, director of engineering for Alexander Smith & Sons Carpet Co., manufacturer of carpets and rugs, has charge of plant equipment, the improvement of existing items and adopting specifications for new. During his 25 years' experience, he has worked on several types of looms and developed the double-face jacquard Wilton loom. There are three types of Wilton looms, i. e., the side draw that pulls the wire out from the side, the longitudinal wire motion in which the yarn weaves from one side to another, and the face to face, wherein the fabric is slit through the center. Many varieties of rugs, all within the Wilton class, are made by those three types of looms whose distinguishing features are the use of a creel, carrying an individual end that passes through a jacquard mechanism controlling the pattern and regulating, by means of

a cutting motion, the height of the pile. The witness' statement that the rug in question is of like character or description to a Wilton was based on its structural appearance, showing five frames in colors with cotton chain warp and filling of jute-cotton combination, and made with a creel and jacquard attachment to imitate an oriental rug with the design carried through to the back.

Elliott I. Petersen, vice president in charge of manufacturing for Bigelow-Sanford Carpet Co., manufacturer of carpets and rugs, including Wiltons, testified that Wilton rugs are manufactured in a continuous piece and, therefore, are never produced with a finished selvage but always require fringing or taping. Another important observation from the witness' testimony is that in weaving a Wilton fabric, it is the choice of the weaver as to whether or not the dead yarn is retained inside the fabric or carried to the outside. In other words, the unused pile yarn is not necessarily "called back" and buried.

James G. Underwood is director of research and in charge of making new fabrics and exploring for new possibilities in carpets and rugs for Mohawk Carpet Mills, whose manufacturing activities include Wiltons. In his early experience, the witness was a Wilton weaver, loom fixer, and assistant superintendent of a Wilton mill. The rug under consideration is of like character or description to a Wilton by reason of being jacquard woven on a shuttle with the yarn being pulled from creels, and possessing a fine warp and filling of cotton-jute mixture. The kind of material used in manufacturing a rug is not a factor in determining its type. As stated by the witness, "To my knowledge, there is no textile material, cotton, jute, synthetic, or wool, that cannot be woven in any of the types of looms that we have at Mohawk."

James H. Patrick, associated since 1936 with the purchase of raw materials and technical problems of the Beatty Manufacturing Co., manufacturer of carpets and rugs, corroborated the previous witness' testimony to the effect that the type of material used in producing a rug is not distinctive of any particular class. Although the rug in question is not a Wilton because of its inferior structural features— general rigidity and degree of binding—the weaving process employed in producing the article is like that followed in making Wiltons.

On the basis of the record as hereinabove outlined, some differences between the "Ispahan" rug in question and a Wilton rug are readily discernible. The backs of the two rugs are distinguishable; the Wilton being comparatively stiff, and the rug in question relatively flexible. Such difference in appearance, however, is of no consequence in our determination of the present issue, as developed *infra*. Nor is the different kind of material used in the pile yarns of the two rugs

under discussion—wool in the Wilton, and rayon in the present merchandise—of any importance herein, especially in the light of convincing statements by defendant's witnesses to the effect that the kind or class of material used on the surface of a rug is not indicative of any type thereof.

Counsel for plaintiff, arguing that the rug under consideration is not of like character or description to a Wilton, stress the process of manufacture, emphasizing that the present merchandise was produced two at a time, face to face, on a machine loom, operating on the jacquard principle, resulting in the design being visible on the back as well as on the face of the rug. *Stephen Rug Mills* v. *United States*, 32 C. C. P. A. 110, C. A. D. 293, cited to support the contention, cannot be applied. That case turned on the principle of commercial designation, the importer having proved that the rug there under consideration was bought and sold at wholesale and was uniformly, definitely, and generally known as "imitation oriental rugs," the classification sustained by the court.

No question of commercial designation is now before us. Determination of the present issue is controlled by the common meaning of the provision for rugs "of like character or description" to Wiltons, paragraph 1117 (a), *supra*. Thus, the question presented is the same as that considered in *United States* v. *Rietmann Pilcer Co.*, 24 C. C. P. A. 371, T. D. 48830, where the court held that the said statutory words are to be "taken and understood in their popular and received import, as generally understood in the community at large and at the time of the passage of the act [Tariff Act of 1930]." Consistent with that interpretation, several elements were taken into consideration, including structural features, use, materials, and appearance. The general application by the court is reflected in the following excerpt from the opinion by Chief Judge Garrett:

We are unable to agree that the fact the rugs at issue are sold as imitation orientals, or the fact that they may simulate oriental rugs in appearance, may be taken as conclusive that they are not of like character or description to Wiltons. * * * Neither are we able to agree that the method of manufacture alone may be taken as decisive of the issue, and the same may be said as to the type of loom used in the weaving process.

If only the process of manufacture be looked to, and it be held that, in order to render a rug "of like character or description" to a Wilton, such rug must, in every particular, be made just as a Wilton is made, then (assuming the method of manufacture to be the sole test) the words "of like character or description" would be unnecessary, because the product would be an actual Wilton and classifiable as such for tariff purposes. Also, if all rugs woven on Wilton looms must be held to be actual Wiltons, then, were it proved that the rugs at issue were woven on such looms (which fact, as has been indicated, is not proved here), it would necessarily follow that they would be classifiable simply as Wiltons, and not as rugs "of like character or description" to Wiltons.

The merchandise involved in the *Rietmann Pilcer* case, *supra*, and which was held to be "of like character or description" to Wiltons, bore

much likeness to the rug under consideration. There, as here, the article was a "soft-back" rug, woven double, or two at a time, face to face on a power loom with jacquard attachment, creating the design that was carried to the back. Both were finished with a cut pile and made to simulate oriental rugs.

The samenesses in so many respects between the two products, coupled with the evidence herein concerning characteristics of Wiltons, which proof parallels the same line of testimony introduced in the *Rietmann Pilcer* case, *supra*, associate the rugs so closely together as to make applicable in the present case the reasoning followed in the cited one. Accordingly, we hold the "Ispahan" rugs in question to be "of like character or description" to Wiltons, classifiable as such under paragraph 1117 (a), *supra*, carrying a dutiable rate of 40 per centum ad valorem, as assessed by the collector.

The conclusion is consistent with comment contained in the Summaries of Tariff Information (1948), volume 11, part 2, a publication prepared by the Tariff Commission pursuant to resolution of the Ways and Means Committee of the House of Representatives, and containing statistical data with respect to imports, exports, tariff rates, and other information relating to conditions of competition between imports and domestic production of various commodities. Referring to paragraph 1117 (a), *supra*, and particularly to the provision for Wilton rugs and rugs of like character or description, the document contains the following pertinent information:

Imports consist predominantly of *rugs made on a plush loom in imitation of the Wilton weave* (included among "rugs of like character" in table 3 below) and of genuine Wilton rugs. Belgium was usually the leading foreign supplier before World War II; in 1943, however, the United Kingdom supplied most of the small imports, and it supplied more than Belgium in 1946. In 1947 Belgium again became the major source. France and *Italy* are the other principal suppliers. [Italics added.]

Counsel for the respective parties, as well as *amicus curiae*, have presented several questions that might have developed in the present case, but in view of our disposition of the primary issue, further discussion becomes unnecessary.

The protest is overruled and judgment will be rendered accordingly.